IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| USAA CASUALTY INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SUZANNE BATEMAN, WENDELL L. EVANS, III, and | : | |
| ALLISON EVERETT KERRY, | : | |
| Defendants. | : | No. 2:07-cv-3700 |

## MEMORANDUM RE: SUMMARY JUDGMENT

**Baylson, J.**                                                                                                                               **October 30, 2008**

USAA Casualty Insurance Company ("USAA") initiated this declaratory judgment action against Defendant Suzanne Bateman McDermott (hereinafter "insured," "Bateman" for purposes of congruency with the caption) and Defendants Wendell L. Evans, III ("Evans") and Allison Everett Kerry ("Kerry") (collectively, "Underlying Plaintiffs"). USAA seeks to have this Court render a judgment on the extent of its duty to defend Bateman in the underlying litigation currently proceeding in Pennsylvania state court brought against Bateman by Evans and Kerry. Presently before this Court is USAA's Motion for Summary Judgment.[1] For the following reasons, USAA's Motion for Summary Judgment will be granted.

---

[1] USAA filed its Motion for Summary Judgment with this Court on April 15, 2008. (Doc. 14). In her response to USAA's Motion, Bateman also filed a Cross-Motion for Summary Judgment on April 29, 2008. (Doc. 17). However, this Court, in its initial Scheduling Order, set the deadline for dispositive motions as April 15, 2008. (Doc. 11). Because Bateman filed her Cross-Motion past the deadline, this Court will only consider USAA's Motion for Summary Judgment. Bateman's failure to file a timely motion, however, does not impact this Court's analysis.

I.      **Background and Procedural History**

     A.      <u>Background of the Case</u>

Prior to the incident at issue in the underlying litigation[2] during the summer of 2005, Defendant Bateman and her husband at the time, William Corbett, owned the residence at 8 Morris Drive in Glen Mills, Pennsylvania. (Underlying Compl. ¶ 8.) Bateman acquired a homeowners insurance policy from USAA for the residence. (Def.'s Statement of Undisputed Facts ¶ 5; Bateman's Resp. Pl.'s Mot. Summ. J. ¶ 2.) The terms of the insurance policy, which are the focus of the declaratory judgment action before this Court, will be discussed more thoroughly below.

In the summer of 2005, Bateman and Corbett contracted to sell their residence to Evans and Kerry. (Underlying Compl. ¶ 11.) Along with the purchase agreement, Bateman and Corbett also signed the Seller's Property Disclosure Statement. (Underlying Compl. ¶ 9.) That Statement included a provision which stated that Bateman and Corbett were not aware of any materials defects to the property that were not otherwise disclosed. (<u>Id.</u>) Upon taking possession, however, Evans and Kerry discovered several defects with the home that they were allegedly not informed of prior to sale, including a roof that needed to be repaired, improper flashing of their chimneys, a malfunctioning central air conditioning system, a malfunctioning second floor heating unit, and unloading of the sump pump into the public sewer. (Underlying Compl. ¶¶ 15, 17.)

---

[2] As will be discussed below, this Court must only consider those factual allegations that are in the complaint of the underlying litigation in determining whether the insurance coverage is applicable here. As such, citations will be made to the underlying complaint, which is Exhibit A to Plaintiff's Declaratory Judgment Complaint.

Upon discovery of the undisclosed defects, Evans and Kerry filed suit in the Court of Common Pleas of Delaware County against Bateman, Corbett, their broker Karen Schambach, their broker's employer Remax Integrity, the Underlying Plaintiffs' inspector John Spoehr, and the inspector's employer Home Pro of the Delaware Valley. (Underlying Compl.)  The Underlying Plaintiffs alleged that Bateman and Corbett, in selling their home, were aware or should have been aware of the issues but failed to inform Evans and Kerry of them.  The Underlying Plaintiffs therefore brought claims against Bateman and Corbett for failure to comply with the Pennsylvania seller disclosure laws, 68 Pa. Cons. Stat. Ann. § 7301 et seq., violations of the Unfair Trade Practices and Consumer Protection Law, 733 Pa. Cons. Stat. Ann. § 20-01, fraudulent and/or intentional misrepresentation, negligent misrepresentation, and civil conspiracy. (Underlying Compl.)  The underlying litigation is currently ongoing.

In response to the suit, Bateman requested a defense and indemnification for defense fees from USAA pursuant to her homeowners insurance policy and/or other policies.  (Compl. ¶ 9; Bateman Answer ¶ 9).  USAA, while initially refusing to provide defense counsel, has subsequently decided to do so.  (Compl. ¶ 10; Bateman Answer ¶ 10).  However, seeking to clarify its rights and obligations under the policy, USAA filed a declaratory judgment action in this Court, arguing that it was not obligated to defend or indemnify Bateman for her litigation costs incurred during the underlying litigation.  Bateman, in her Answer, filed a counterclaim seeking a declaratory judgment that USAA was obligated to defend her.  USAA argues that the homeowners policy does not cover the insured for any claims arising out of misrepresentations made during the sale of the home.  Bateman, on the other hand, argues that the insurance policy terms do provide coverage for these types of lawsuits.

B.      <u>Insurance Policy Terms</u>

While Bateman has had several homeowners policies with USAA in the past, USAA seeks to clarify its obligations with respect to policy # 00784 82 98 91A, the policy covering the residence at issue in the underlying litigation. However, each of Bateman's policies also apparently contains similar language.[3] The policy provides for the following:

> Section II - Liability Coverages, Coverage E - Personal Liability
> If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
> . . .
> 2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.

(Compl. Ex. B, at 24.) As part of the exclusions for the defense/indemnity coverage, the policy states:

> Coverage E - Personal Liability does not apply to:
> a. liability:
> . . .
> (2) under any contract or agreement. However, this exclusion does not apply to written contracts:
> (a) that directly relate to the ownership, maintenance or use of an insured location;
> . . .

---

[3] While Bateman in her Answer and Counterclaim initially noted that she was insured by USAA under other policies and that they may also provide a guarantee of defense and indemnification (Bateman Ans. ¶¶ 6, 7, 9, 20), Bateman has not produced copies or even the language of those additional policies. Instead, Bateman apparently acknowledges that the language of those policies is identical to the one at issue. <u>See</u> (Bateman Mem. Supp. Resp. Pl.'s Mot. Summ. J. at 8) ("USAA acknowledges that the insurance policy covers property damage from an occurrence. Under the policy, 'occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, in property damage. USAA and McDermott agree on this definition."); (Bateman Mem. Supp. Resp. Pl.'s Mot. Summ. J. at 19) ("Under the policy, 'property damage' includes physical damage to or destruction of, tangible property and includes the loss of use thereof.").

>   unless excluded in (1) above or elsewhere in this policy;
>   b.  property damage to property owned by the insured.

(Compl. Ex. B at 14.)  The primary dispute in this case, however, centers on the definitions section.

>   Definitions
>   . . .
>   5.  "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
>   a.  bodily injury; or
>   b.  property damage.
>   . . .
>   1.  "bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.
>   . . .
>   6.  "property damage" means physical damage to, or destruction of tangible property, including loss of use of this property.

(Compl. Ex. B at 1.)  The term "accident" is not defined.

## II.     Jurisdiction and Legal Standard

USAA instituted this action seeking a declaratory judgment under the Federal Declaratory Judgment Act, codified at 28 U.S.C. § 2201.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) since the parties are diverse and the amount in dispute exceeds $75,000.

When a federal district court presides over a case grounded in diversity jurisdiction, the court must apply the choice-of-law rules of its forum state.  Klaxon v. Stentor Elec. Mfg., 313 U.S. 487, 496 (1941); LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  As there is no dispute between the parties concerning which law applies here, this Court will apply Pennsylvania law.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

**III.   Discussion**

    A.    <u>Parties' Contentions</u>

In its Motion for Summary Judgment, USAA argues that it has no obligation to provide a defense or indemnify Bateman for her defense fees for the underlying litigation. USAA points out that the scope of its defense obligations are limited to claims arising out of an "occurrence," which is defined as an "accident." USAA contends that misrepresentation during the sale of a home, even if negligently made, can never constitute an "accident." USAA also argues that, even if the misrepresentation does fall within the definition of an "accident," the harms that were caused here were not "property damage." Since no physical damage was actually done to the property, USAA contends that the only loss suffered is an economic loss.

On the other hand, Bateman argues that, since negligence has been recognized as falling within the scope of "accident," a negligent misrepresentation should also come within the scope of an "accident," even where the incident arises from a contract. Concerning the definition of "property damage," Bateman notes both that there is no breach of contract claim in this litigation and that if tort claims succeed, they always result in recovery for bodily injury or property damage, not economic damages.

    B.    <u>Analysis</u>

As there are no issues of material fact remaining in the case, the only remaining question is whether the insurance policy covers the disputes alleged in the underlying complaint. First, "[t]he interpretation of an insurance policy is a question of law . . . ." <u>Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.</u>, 908 A.2d 888, 897 (Pa. 2006) (citing <u>401</u>

Fourth Street v. Investors Ins. Co., 879 A.2d 166, 170 (Pa. 2005)).  Courts may therefore dispose of cases on summary judgment where the sole issue concerns the interpretation of the policy.

There are several well-recognized principles under Pennsylvania law that courts should utilize in interpreting the legal meaning of terms in an insurance policy.  Those words in the policy that are of common usage should be "construed according to their natural, plain, and ordinary sense."  Kvaerner, 908 A.2d at 897.

> Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy.  When the language of the policy is clear and unambiguous, we must give effect to that language.  However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contracts [sic] prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage.

Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 290 (Pa. 2007) (internal citations and quotations omitted).

For purposes of interpreting the terms of insurance polices for a duty to defend and/or indemnify, the duty to defend is broader than the duty to indemnify.  Where the underlying complaint makes at least one allegation that falls within the scope of the policy's coverage, the duty to defend is triggered, even where an insured is ultimately found to be not liable.  See Gen. Accident Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa. 1997) ("If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover.").

In determining whether the underlying litigation falls within the scope of the insurer's duty to defend, a court must examine only those factual allegations made within the "four corners" of the underlying complaint. Despite some historical ambiguity on the issue, the Pennsylvania Supreme Court has held that the duty can not be triggered by allegations outside of the complaint, including discovery responses produced in either the underlying litigation or the insurance dispute litigation. See Kvaerner, 908 A.2d at 896 ("[A]n insurer's duty to defend and indemnify [must] be determined solely from the language of the complaint against the insured. . . . [A]n insurer's duty to defend is triggered, if at all, by the factual averments contained in the complaint itself."). Coverage is also not triggered by the skill of a plaintiff's pleadings. Rather, courts must look only at those factual allegations in the complaint, not the legal claims, in considering whether a suit falls within the scope of the duty. Mutual Ben. Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999) ("[T]he particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint.").

1.   Scope of the Term "Accident"

In determining whether USAA has an obligation to defend Bateman in the underlying litigation, it is necessary to first consider the terms of the policy. The homeowners insurance policy through USAA imposes the duty of defense on USAA for those lawsuits "brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies." (Compl. Ex. B at 24.) An "occurrence" is defined as "an accident . . . which results, during the policy period, in a. bodily injury; or b. property damage." (Compl.

Ex. B at 1.)  The term "accident," however, is not defined.  The primary dispute between the Parties is whether the acts alleged in the underlying complaint can be fairly characterized as an "accident."

USAA contends that the primary nature of the underlying transaction was a contract, and, while the Underlying Plaintiffs may have cast their claims in tort, the true nature of the underlying complaint concerns the intentional act of selling Bateman's home.  Bateman, on the other hand, argues that the real issue in the case is the alleged act of misrepresentation that occurred incident to the sale.  Bateman notes that the Pennsylvania Supreme Court has recognized negligent acts as falling within the scope of "accident" and so negligent misrepresentation incident to a real estate contract should also fall within the term.

This Court has previously considered the interpretation of a policy arising out of similar circumstances in State Farm Fire & Casualty Co. v. Czop, Civ. A. No. 02-1048, 2004 WL 632724 (E.D. Pa. Feb. 11, 2004).  In that case, defendant Czop contracted to sell a piece of land suitable for development by the purchaser.  When the buyer discovered that the land had previously been used as a landfill and that a building permit would not be issued for the land, the buyer filed suit against Czop in state court for both breach of contract and fraud; the fraud count alleged that Czop "concealed or failed to disclose defects in the property and misrepresented the property's true condition."  Id. at *1.  Czop was the insured in three different insurance policies, one of which was a homeowners insurance policy, with plaintiff State Farm.  State Farm instituted a declaratory judgment action seeking to determine its rights and obligations under the policies concerning the defense of Czop.  Notably, the language of the insurance policies was virtually identical to those in this case.

-10-

After considering the language of the insurance policies and the Pennsylvania doctrine on similar language, this Court held that "an 'occurrence,' as defined within the scope of the policies, has not been alleged against Czop and that consequently State Farm has no obligation to defend Czop on the underlying Montco Complaint." Id. at *5.  This Court first recognized that a standard breach of contract claim was not an "accident" and was therefore not within the scope of the policy.  After considering prior case law, this Court recognized that "[i]ntentional acts certainly cannot be described as accidental, and a negligent misrepresentation is no accident either." Id. at *6.  Finally, this Court held that "assuming arguendo that [the underlying plaintiff's] action alleged negligent misrepresentation, . . . State Farm still would have no obligation to defend and indemnify Czop as the damages claimed clearly arose out of a breach of contract and not from an accident." Id. at *7.  Without a claim that fell within the terms of the policy, State Farm had no obligation to defend Czop in the underlying litigation.  See also Foremost Ins. Co. v. Erickson, Civ. A. No. 07-0195, 2007 WL 2301119 (E.D. Pa. Aug. 7, 2007) (granting insurer's motion for summary judgment and holding that insurer did not have a duty to defend or indemnify on similar policy terms where underlying plaintiffs alleged that the defendants "failed to disclose the presence of significant damage and deterioration" of the property sold).

Since Czop, the Pennsylvania Supreme Court has considered several cases concerning the interpretation of insurance policies.  However, none of those cases in any way overturns or undermines this Court's rationale in Czop.  One of the most recent Pennsylvania Supreme Court decisions on the interpretation of "accident" is Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888 (Pa. 2006).  In Kvaerner, the Pennsylvania Supreme

Court interpreted a commercial general liability insurance policy, which insured a company that built a piece of equipment for Bethlehem Steel. Bethlehem Steel sued the insured, arguing that the equipment that the insured delivered was faulty due to poor worksmanship. Bethlehem Steel argued that the insured breached the contract by failing to build the equipment at the agreed-upon specifications. Under the commercial insurance policy, the insurer promised to defend the insured only when a claim was instituted against the insured seeking or alleging damages for property damage which resulted from an "occurrence." In similar terms, an "occurrence" was also defined as an "accident."

In establishing the scope of "accident" for purposes of Pennsylvania law, the court first utilized the dictionary definition of the word. "Webster's II New College Dictionary 6 (2001) defines 'accident' as '[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.' The key term in the ordinary definition of 'accident' is 'unexpected.' This implies a degree of fortuity that is not present in a claim for faulty workmanship." Id. at 897-98. Because that degree of unexpectedness was not present in a case of faulty worksmanship, the court held that the scope of the insurance policy did not cover the defense of such a suit. "We hold that the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context." Id. at 899.

On the opposite side of the factual spectrum, the Pennsylvania Supreme Court considered more traditional claims of negligence in Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286 (Pa. 2007). In Donegal, the parents of a child were insured under a homeowners policy issued by

Donegal Mutual Insurance Company with similar policy terms to the case at hand. The son of the defendant parents went on a shooting spree one evening, killing or injuring six victims. When the injured victims and the deceased's estates sued the parents for, among other things, negligence in handling their child, the parents sought indemnification from the insurance company. One of the issues on appeal was whether an allegation of negligence on the part of the parents constituted an "occurrence" for purposes of the insurance policy.

The court ultimately held that the insurance policy "requires [the insurer] to defend [the insured] against [the third-party] Plaintiffs' claims of negligence even where that alleged negligence may have led to the intentional acts of a third party." Id. at 292. The court recognized that "the term 'accident' within insurance polices refers to an unexpected and undesirable event occurring unintentionally, and that the key term in the definition of the 'accident' is 'unexpected' which implies a degree of fortuity. An injury therefore is not 'accidental' if the injury was the natural and expected result of the insured's actions." Id. at 292. On the basis of such a definitive scope, the court held that the insurer had a duty to defend the insured parents in the negligence lawsuit against them. The court particularly emphasized that the shooting spree committed by the child "cannot be said to be the natural and expected result of Parents [sic] alleged acts of negligence. . . . Donegal is therefore required to defend Parents." Id. at 293.

In the underlying complaint filed by Evans and Kerry in state court, they alleged that Bateman failed to disclose several material defects in the home that they were aware of or should have been aware of, including a roof with leakage and improper flashing of the chimneys.[4]

---

[4] The underlying complaint alleges that:
On April 26, 2005, Sellers and Broker executed a Seller's Property Disclosure Statement "Disclosure Statement" for the Subject Property. . . . (¶ 9).
The Disclosure Statement materially represented that, inter alia:
. . .
e. Defendant Sellers were not aware of any material defects to the property, dwelling or fixtures which were not disclosed elsewhere on the Disclosure Statement. (¶ 10).
Defendant Sellers . . . had actual and/or constructive knowledge of the additional defects to the Subject Property which were not disclosed, including but not limited to the roof, central air conditioning system, inter alia . . . . (¶ 52).
Plaintiffs purchased the Subject Property from Defendant Sellers on August 31, 2005 for $675,000. In reliance upon the Disclosure Statement and the Inspection Report, Plaintiffs believed that there were no material defects and/or extensive problems with the roof at the time of purchase. (¶ 14).
Immediately upon moving into the Subject Property and thereafter, Plaintiffs discovered extensive leaking from the roof which was not disclosed in either the Disclosure Statement or the Inspection Report. (¶ 15).
In addition to the roof defects described therein, there were other material defects in the Subject Property which, upon information and belief, were known to Defendant Sellers, Defendant Broker, and Defendant Remax but were not disclosed to Plaintiffs, including but not limited to:
a. improper flashing of the chimneys;
b. malfunctioning central air conditioning system;
c. malfunctioning second floor heating unit; and
d. unloading of the sump pump into the public sewer. (¶ 17).
Defendant Sellers . . . made false representations of material fact that the roof did not require major repair and/or replacement, the central air conditioning system worked "great," and no additional defects existed besides the defects disclosed on the Seller Disclosure Statement. (¶ 35).
Defendant Sellers . . . failed to use reasonable care in obtaining, determining, and conveying information and/or making representations of material fact to Plaintiffs regarding the ability to convey the Subject Property without additional material defects to the Subject Property which were not disclosed in the Disclosure Statement. (¶ 53).
Defendant Sellers . . . made the representations with the intent to induce Plaintiffs to enter the Agreement of Sale. (¶ 38).
Defendant Sellers made the representations with the intent to mislead Plaintiffs to enter the Agreement of Sale. (¶ 46).

While the Underlying Plaintiffs have alleged both intentional acts and a negligent misrepresentation, courts have repeatedly held that these acts are outside the scope of an "accident." As this Court recognized in Czop, the interaction between the parties at issue in the underlying litigation is the contract for both the sale of land and the home. The Underlying Plaintiffs have essentially argued that, after relying on Bateman's misrepresentations, the house they received was not the house they believed they had purchased. While Bateman is certainly correct that pure negligence claims do come within the scope of an "accident," this is not a pure negligence case. Despite the fact that the Underlying Plaintiffs have not brought a breach of contract claim, the negligent misrepresentation claim "arose out of a breach of contract and not from an accident." Czop, 2004 WL 632724, at *7. The Pennsylvania Supreme Court's decisions after Czop have not considered allegations similar to the ones made here. However, the decisions have reaffirmed the primary principle that this Court relied on in Czop and the principle that this Court relies on today: an "accident" is an "unexpected and undesirable event" that "implies a degree of fortuity." Kvaerner, 908 A.2d at 897-98. The Underlying Plaintiffs' factual allegations do not consist of "unexpected" acts, nor do they have the requisite "degree of fortuity." As such, the underlying complaint does not allege an "accident" for purposes of the USAA homeowners insurance policy, and USAA therefore does not have an obligation to defend or indemnify Bateman in the underlying litigation.

---

Plaintiffs were ignorant as to the falsity of Defendant Sellers, Defendant Broker, and Defendant Remax's representations. (¶ 37).
Plaintiffs acted upon and justifiably relied on Sellers . . . representations, incurring damages as a direct result thereof. (¶ 40).

2. Scope of the Term "Property Damage"

In addition to not being an "accident," the harm alleged by the Underlying Plaintiffs in their complaint also does not constitute "property damage." The terms of the insurance policy only impose a duty to defend on USAA where the suit arises out of "occurrences" that result in "bodily injury" or "property damage." (Compl. Ex. B, at 24.) The parties do not contend that "bodily injury" was alleged in the underlying complaint. Instead, the parties argue over whether the underlying complaint alleges a harm that falls within the term "property damage." Property damage occurs when the occurrence causes "physical damage to, or destruction of tangible property, including loss of use of this property." (Compl. Ex. B, at 1.) Here, the harm that the Underlying Plaintiffs suffered was not "property damage" as the insurance policy defines it.

The acts at issue in the underlying lawsuit amounted to a misrepresentation of the status of the home, whether it be intentional or negligent. At no point did Bateman's acts ever inflict damage on the home that was not already in existence prior to the acts in question. Similarly, Bateman's acts did not even limit the use of the home for the Underlying Plaintiffs. While the alleged acts did impose on the Underlying Plaintiffs some harm, the "tangible property" here was not changed in any way by the misrepresentation. The house was in the same state prior to the sale as it was after the sale. The only harm that occurred was that the Underlying Plaintiffs did not purchase the home they expected to purchase. This, however, does not constitute "property damage."

> The qualifying term "tangible" generally is understood to denote property that is physical and capable of being touched and perceived. "Physical injury" is understood to have occurred when the property is altered in appearance, shape, color or in other material dimension. Conversely, to the average mind, tangible

> property does not experience physical injury if that property suffers
> intangible damage, such as diminution in value as a result from the
> failure of a component . . . to function as promised.

<u>USA Fin. Servs., Inc. v. State Farm Fire & Cas. Co.</u>, Civ. A. 04-1619, 2007 WL 2688720, at *3 (W.D. Pa. Sept. 11, 2007). Because the Underlying Plaintiffs have not alleged that "damage" occurred to "tangible property" and have instead alleged that they did not purchase what they expected to, the complaint does not fall within the scope of USAA's duty to defend or indemnify.

      An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| USAA CASUALTY INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SUZANNE BATEMAN, WENDELL L. EVANS, III, and | : | |
| ALLISON EVERETT KERRY, | : | |
| Defendants. | : | No. 2:07-cv-3700 |

### ORDER

AND NOW, this 30th day of October, 2008, for the reasons stated in the foregoing Memorandum, it is hereby ORDERED that

1. Plaintiff's Motion for Summary Judgment (Doc. 14) is GRANTED;

2. The Clerk shall mark this case as CLOSED.

BY THE COURT:

 /s/ Michael M. Baylson
Michael M. Baylson, U.S.D.J.

A:\USAA v Bateman SJ Memo and Order.wpd